**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 17 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

OKLAND OIL COMPANY, an
Oklahoma corporation;
INTERNATIONAL FINANCIAL
SERVICES GROUP, INC., an Oklahoma
corporation,

      Plaintiffs-Appellees,

v.

DERAL D. KNIGHT,

      Defendant-Appellant,

and

JAMES D. MOORE; JAMES A.
MOORE, SR.,

      Defendants.

No. 02-6028

No. 03-6026
(D.C. No. 99-CV-1302-M)
(W.D. Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **BALDOCK**, and **LUCERO,** Circuit Judges.

In the first of these two consolidated appeals (Case No. 02-6028), Deral D. Knight

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

appeals a jury verdict of $1.5 million in favor of Okland Oil Co. (Okland) and International Financial Services Group (IFSG) and against Knight and his codefendants, jointly and severally. In the second appeal (Case No. 03-6026), Knight appeals the district court's denial of his post-judgment motion pursuant to Federal Rule of Civil Procedure 60(b)(3). We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.

*The Arkansas Project* – The Arkansas Project involved a plan to develop a gas field located near Magnolia, Arkansas. The plan consisted of three transactions, namely: acquisition of the gas field, acquisition of a pipeline system, and the refurbishment and installation of a cryogenic gas processing plant. The cryogenic plant was to be used to distill valuable liquids from the gas.

*Relevant people and entities* – Okland is an oil and gas exploration company. J. Steve Wetwiska is the company's president. George N. Keeney, III, was a director, vice president, and chief financial officer of the company. IFSG was formed by Keeney and he was its president.

Knight was president and 90% owner of Knight Equipment & Manufacturing Corporation (KEMCO), which manufactured, refurbished, and installed gas processing plant equipment. In May 1995, Knight sold his KEMCO stock to Concord Energy (Concord) and KEMCO became a wholly-owned subsidiary of Concord. Knight remained as chairman of the board and president of KEMCO until sometime in 1996 or

2

1997 when he became chairman of the board and CEO of Concord.

James D. Moore (Moore) and James A. Moore, Sr., (Moore Sr.), who are not related, were professional engineers in the fields of gas gathering, gas processing, and gas processing design. In the summer of 1995, Moore, Moore Sr., and Earle Mattes formed M&M Gas Corporation (M&M Gas). The three also owned, in their individual capacities, a gas processing plant in Oklahoma known as the "Magic Medford Plant."

Robert Gershen (Gershen) is manager of Energy Income Funds (EIF). In addition to the plaintiffs' investment, the financing of the Arkansas Project would ultimately depend on a $10.5 million loan from EIF.

*Initial involvement of Concord, KEMCO, and Moore Sr.* – Sometime in 1994, Concord considered investing in the Arkansas Project and hired Moore Sr. as a consultant to review the project. Concord decided not to invest and released Moore Sr. from the consulting agreement so he could pursue the Arkansas Project on his own. At trial, Moore Sr. testified that his release was conditioned upon KEMCO being awarded the construction contract to refurbish and install the plant if Moore Sr. found investors to finance the project.

*The FROG time period* – Moore Sr., Moore, and Mattes formed M&M Gas after Moore Sr. was released from Concord. M&M Gas did not have the resources to pursue the Arkansas Project on its own and appeared to have secured an investor, First Reserve Oil & Gas Company (FROG) by early 1996. The deal did not materialize but some

3

significant events occurred in anticipation of the proposed agreement. M&M Gas formed M&M Gathering, L.L.C. (M&M Gathering), which was intended to be owned jointly by FROG and M&M Gas, and was to exist solely for purposes of the Arkansas Project development. FROG conditioned its investment in M&M Gathering on commitment by M&M Gas of $154,000 of its own money, and a construction contract with firm commitment by the contractor to refurbish and install the cryogenic plant at a fixed price. In an effort to satisfy FROG's prerequisites, KEMCO (through Knight) and M&M Gas (through the Moores) entered into an agreement.

At trial, plaintiffs argued the gist of the agreement was that Knight artificially would inflate the cost of refurbishing and installing the gas processing plant to fund a "kickback" to M&M Gas, which M&M Gas would in turn use to fund its investment in the Arkansas Project. In support of their theory, plaintiffs introduced several versions of a price list prepared by Knight. Each version indicated one price for M&M Gas ($3,735,000) and a different price for M&M Gathering ($4,000,000). The price lists indicated a subtraction of $265,000 from the M&M Gathering price for the "Purchase of Magic Medford + 200 shares of M&M Stock," resulting in a new total of $3,735,000. App. at 1312, 1316. It is undisputed that by February 1996, KEMCO, through Knight, had agreed to purchase from M&M Gas the Magic Medford plant for $65,000, and 200 shares of M&M stock for $1,000 per share. A draft agreement dated February 15, 1996, between Knight and Moore Sr., but never signed, reflects (1) that Knight paid $50,000 to

4

M&M Gas as a deposit on the agreement; and (2) the stock purchase was contingent upon the Arkansas Project going forward and KEMCO being awarded the contract to refurbish and install the gas processing plant.

During trial, Knight testified that he "didn't particularly value" M&M Gas shares. Id. at 3546. He stated that "KEMCO didn't value them very much, Concord didn't value them very much, and I didn't value them very much at that time." Id. at 3547. Although KEMCO eventually received M&M Gas shares, the shares were never declared as received in KEMCO's SEC filings. Knight insisted at trial that the $265,000 subtraction on the price lists reflected a "sales commission," apparently for the Moores' assistance in obtaining the contract for KEMCO. Id. at 3545. With regard to the M&M Gas shares, he further testified: "We were in the habit of getting as much benefit for our cost as we could. M&M was out there offering shares of their company, so we accepted." Id. at 3546.

In contemplation of the closing with FROG, on February 26, 1996, Knight and Moore Sr. executed the "Agreement for Movement, Refurbishment and Installation of Cryogenic Gas Plant Facility," by and between M&M Gathering (buyer) and KEMCO (contractor). Id. at 2872. The total contract price was $4,119,500 but credits, apparently for equipment to be retained by KEMCO after the project, were subtracted, resulting in a contract balance of $3,909,500. The buyer's project manager was given certain authority over so-called "change orders" and Moore was designated as the project manager in

Exhibit F to the contract. After the FROG deal failed, the Moores began looking for new investors and designation of the project manager was blank in a new Exhibit F to the contract.

*Plaintiffs' involvement* – In July 1996, Moore presented Keeney with a business plan that, among other things, stated: (1) KEMCO would be the contractor that would refurbish the gas processing plant; (2) potential downsides included cost overruns and delays; (3) there were "no known conflicts of interest between the investor and any of the entities involved in the gas project transactions"; and (4) M&M Gas had "no relationships with . . . any of the parties from whom assets [were] being purchased." Id. at 2766.

By the end of July 1996, Okland and M&M Gas had signed a letter agreement providing that Okland would be "performing its due diligence," but also that Okland might "require the services of M&M in connection with its due diligence efforts." Id. at 1364-65. The agreement set forth terms of compensation for assistance provided by M&M Gas. At trial, Keeney testified that Okland retained the Moores as consultants to assist in analyzing the economics of the cryogenic plant and the project in general, including services in connection with Okland's due diligence. The Moores also provided plaintiffs with three volumes of "due diligence" materials, which included a copy of what was represented as the "KEMCO contract."

In August 1996, Knight and the Moores attended two meetings with plaintiffs in Oklahoma City. Gershen and other EIF representatives also attended the second meeting.

6

Keeney testified that at the first meeting, Knight and the Moores represented, among other things, that (1) the KEMCO contract was a "turnkey" contract, meaning the work was to be performed for a designated price and was to result in an operational facility; (2) the KEMCO contract had been negotiated at arm's length by unrelated parties; and (3) KEMCO successfully had completed a previous similar project, the Blacklake plant, in Louisiana for the Moores' former employer, Western Gas. Although Keeney inquired about obtaining other bids for the plant, he was dissuaded by the Moores' assurances that they had negotiated an extremely favorable price with KEMCO. Wetwiska testified that, at the second meeting, Knight answered a series of questions from EIF's general counsel and its accountant and "[e]veryone seemed to be satisfied that we had a turnkey contract." Id. at 3870.

On September 20, 1996, plaintiffs formed Magnolia Gas Company, L.L.C., and MKP Production Company, L.L.C. (the LLCs) to take over the Arkansas Project. The LLCs each consisted of ownership by Okland of 62.1%, by M&M Gas of 29%, by IFSG of 6.9%, and by Pat Bryan (an individual investor) of 2%. Okland was to be the managing member.

On September 23, Moore Sr. forwarded a proposed assignment of the KEMCO contract to the LLCs. Moore Sr. advised Okland that the agreement was the same KEMCO agreement contained in the due diligence books. Okland, as managing member of the LLCs, accepted assignment of the KEMCO contract on September 25. As a result,

upon closing with EIF, there would be an initial payment due KEMCO of $1.3 million. On September 26, Moore Sr. requested and Knight wire transferred $150,000 to M&M Gas for 150 shares of M&M Gas stock. On September 26 and 27, plaintiffs closed on the loan with EIF and Okland made its $1.5 million contribution to the LLCs. Immediately after closing, Okland caused the LLCs to make the initial payment of $1.3 million to KEMCO. On October 3, KEMCO wire transferred $115,000 to M&M Gas, and on October 9, M&M Gas issued a check labeled "loan repayment" to Knight personally in the amount of $50,000, which Knight deposited in his personal bank account. Moore Sr. testified that the $50,000 was an overpayment by KEMCO and the check was mistakenly labeled "loan repayment."[1]

*Terms of KEMCO contract* – Keeney testified at trial that he reviewed the KEMCO contract and concluded it was a turnkey contract. Article I of the contract, captioned "Scope of Work," provided: "Contractor (KEMCO) shall furnish materials and supplies, and shall design, fabricate, recondition, modify, transport and assist in start-up of a Cryogenic Gas Plant and related treating facilities at Company's McKaime, Arkansas

---

[1] The evidence shows the following payments: (1) sometime before February 15, 1996, $50,000 from Knight to M&M Gas, (2) on September 26, 1996, a $150,000 wire transfer from Knight to M&M Gas purportedly for 150 shares of M&M Gas in the name of Knight's wife, (3) on October 3, 1996, a $115,000 wire transfer from KEMCO to M&M Gas, and (4) on October 9, 1996, a $50,000 check from M&M Gas to Knight, which Knight deposited in his personal account. Thus, it appears that KEMCO and Knight collectively made payments to M&M Gas totaling $315,000, of which $50,000 was returned to Knight personally.

8

location, in accordance with the Exhibits which are attached hereto." Id. at 2532. Exhibit A provided that "[t]he scope includes all Work necessary by Contractor to make the plant operate within the parameters specified in Exhibit E." Id. at 2540. Exhibit E set forth specific design and material standards. Article 6, captioned "changes, additions or deletions," stated:

> Company [buyer] reserves the right during the progress of this work to make any changes, additions or deletions in the original plans and specifications. All changes are to be made in writing and accepted by both parties before proceeding with the work . . . . No bills for extras will be allowed unless ordered in writing by Company as per Exhibit G.

Id. at 2533. Pursuant to Exhibit G, the client's project manager was required to "initiate a change order immediately upon any request by the client [party other than KEMCO] for work outside the initial scope." Id. at 2551. Thereafter, the contractor would estimate the cost of the changes and, finally, the project manager would obtain the client's written approval of the change order. Keeney testified that after reviewing the contract, he concluded that Okland, as the managing member of the LLCs, would have ultimate authority to approve or disapprove change orders.

*Change orders and problems with KEMCO's work* – By January 30, 1997, KEMCO was proposing about $692,700 in change orders. Okland was not aware of all of the proposed change orders. In a February 4, 1997, status report to Okland, Moore Sr. represented that change orders would result in approximately $250,000 in overruns on the KEMCO contract. Moore testified that as early as February 1997, he had a lot of

9

problems with KEMCO, felt the quality of its work was not good, and believed it should have been replaced. However, he testified that he did not consider recommending that KEMCO be removed as a contractor.

Plaintiffs, Knight, and the Moores met to discuss the proposed change orders. Knight and Moore represented to plaintiffs that they had negotiated an agreement to add approximately $400,000 to the contract price and Okland caused the LLCs to advance $404,000 to KEMCO on the change orders. Keeney and Wetwiska expressed dissatisfaction with KEMCO's performance at this meeting and raised the possibility of firing KEMCO. However, the Moores assured plaintiffs that KEMCO would complete the plant by early May and plaintiffs were persuaded to stay with KEMCO. By April 1997, the Moores were predicting completion by June 1, 1997.

On June 23, 1997, Dale Burford, an M&M Gas shareholder and employee, advised Moore by a handwritten memo of 12 separate defects in the plant and conveyed Burford's conclusion that the quality of the work being performed by KEMCO was poor and would not result in an operational facility. The memo was not forwarded to plaintiffs. Moore Sr.'s July 13 status report to plaintiffs did not identify the problems referred to in Burford's memo.

By the end of August 1997, the LLCs had made payments to KEMCO in excess of the original contract price and construction was not complete. Plaintiffs engaged Don Nicol, an independent consulting engineer, to evaluate the appropriateness of new

10

proposed change orders. Keeney scheduled a meeting between Nicol and KEMCO for September 2, 1997. On the weekend before the meeting, Moore, Moore Sr., and Knight met and a settlement was reached regarding the change orders. The Moores were aware that Okland objected to some of the change orders, and Moore was aware that KEMCO was delivering defective equipment and that KEMCO's work had been poor in quality. Moore hoped that his approval of the change orders and KEMCO's threat of a lawsuit would force the LLCs to pay the disputed charges. When Nicol arrived for his scheduled meeting on September 2 with KEMCO, Moore Sr. advised there was no need for the meeting. Moore had authorized additional payment to KEMCO of $376,933.75, which was in addition to the prior payment of $404,000 in change orders.

On September 15, 1997, Moore Sr. for the first time asserted that the agreement was not a turnkey contract. In a letter to Okland, he stated: "The contract was not encompassing of all the equipment and ancillary items needed for a complete plant." Id. at 1837. He also stated: "The entire contract was assigned without amendment. This means that the specific term of the contract designating James D. Moore as the project manager is still in effect." Id. at 1836. Shortly thereafter, Okland sent KEMCO a list of items that Nicol recommended be resolved and KEMCO left the job. On September 26, 1997, the LLCs filed a lawsuit against KEMCO in Arkansas for breach of contract. On September 30, 1997, KEMCO filed a lawsuit against the LLCs in Texas and attached to the complaint was a copy of the contract with the original Exhibit F designating Moore as

11

project manager. Sometime in early 1997, M&M Gas withdrew from the LLCs. At trial, Okland's accountant testified that Okland never received the version of the contract attached to KEMCO's complaint and that the version it received did not designate a project manager. Gershen also testified that the version of the contract contained in EIF's loan files did not designate a project manager.

*Blacklake project* – As noted, according to Keeney, the Moores and Knight referred to the Blacklake project as a similar project that successfully had been completed by KEMCO. It is undisputed that Knight provided plaintiffs a KEMCO brochure touting the Blacklake project as an example of a plant "purchased and relocated, including engineering, reconditioning, modification, installation and start-up." Id. at 1856. In fact, KEMCO did not complete the project and KEMCO was shut down by the state of Louisiana for lack of a contractor's license. Western Gas, the Moores' former employer and the client in the Blacklake project, sued KEMCO and the case was settled in late March 1996. Knight admitted at trial that neither he nor the Moores advised plaintiffs about the problems with the Blacklake project.

*Plaintiffs' continued commitment to the project* – Kenney testified on cross-examination at trial that as late as October 1998 plaintiffs were still trying to make the Arkansas Project survive, primarily by buying out the contractual right then held by Arkansas Power & Light to purchase gas from the Arkansas Project. He also testified that at that time he considered the economics to be "very shaky due to high operating

costs relative to the low liquid prices." Id. at 3198. On redirect examination, he testified:

> Well, the plant was still not working. And as a result – and this is in October of '98. The plant still wasn't working properly. As a result of that entire circumstance, we had lost the cash flow benefit of being able to extract liquids from the anticipated date, which would have been June or July of '97, all the way until October of '98. Those are not revenue dollars that can ever be recovered. Once that gas is produced, it's burned at a power plant, and you can't ever recover those liquids. They're simply burned at the power plant for AP&L.
> And because of that, there was just a tremendous hole in the economics of the project.

Id. at 3306-07. Gershen testified that from the beginning, his primary concern was the "satisfactory completion and startup of the new plant" because "there is no cash flow until [the plant is] up and running." Id. at 3819-20. According to Gershen, delay in completion of the plant was "a significant contributing factor" in the failure of the Arkansas Project. Id. at 3820.

The LLCs ultimately filed for bankruptcy and their assets were repossessed by the lender. Plaintiffs' interest in the LLCs had no equity value and plaintiffs received no distributions in bankruptcy court.

*Procedural history* – Plaintiffs filed suit on August 31, 1999. The complaint contained over 30 paragraphs of factual allegations under the heading "Fraud, Constructive Fraud, Negligent Misrepresentation, Breach of Duty of Loyalty and Deceit." Following a two-week trial, the jury found in favor of plaintiffs on fraudulent nondisclosure or concealment, constructive fraud, and negligent misrepresentations. The jury also found that Knight, Moore, and Moore Sr. had participated in a civil conspiracy

13

to commit fraud and had been involved in a joint venture. On September 24, 2001, the jury returned a verdict of $1.5 million in favor of plaintiffs and against defendants, jointly and severally. Having been instructed on defendants' statute of limitations defense, the jury found by special interrogatory that plaintiffs' claims were not time barred. The district court entered judgment consistent with the jury's verdict. Knight filed a motion pursuant to Federal Rule of Civil Procedure 60(b)(3) for relief from judgment, alleging plaintiffs had concealed documents during discovery, which was denied.

## II.

On appeal, Knight contends (1) there was insufficient evidence to support a causal link between the alleged misrepresentations and omissions and plaintiffs' losses; (2) the district court erred in making certain evidentiary rulings; (3) the court erred in including previously-unpled theories and allegations in its final pretrial order; (4) the court erred in allowing evidence of certain alleged misrepresentations and omissions when, according to Knight, claims based on such allegations were barred by the statute of limitations; (5) there was insufficient evidence to support the jury's finding that Knight and his codefendants were part of a joint venture; and (6) the court erred in denying his Rule 60(b) motion for post-judgment relief.

### *Sufficiency of evidence as to causation*

Knight argues plaintiffs failed to present sufficient evidence to establish a causal link between the damages awarded and defendants' alleged wrongful conduct. In

14

response, plaintiffs argue that Knight waived this argument by failing to raise it in his Rule 50(a) motion at the close of plaintiffs' case. Alternatively, plaintiffs contend there was sufficient evidence to support the jury's verdict.

Plaintiffs are correct that issues not raised in an initial Rule 50(a) motion may not be asserted in a subsequent post-trial motion for judgment as a matter of law under Rule 50(b). See Fed. R. Civ. P. 50; Hinds v. General Motors Corp., 988 F.2d 1039, 1045 (10th Cir. 1993). It is undisputed that Knight raised the causation issue for the first time in a post-trial motion for judgment as a matter of law pursuant to Rule 50(b). However, when Knight made his Rule 50(b) motion, plaintiffs failed to argue that it exceeded the scope of his Rule 50(a) motion. "[W]hen the non-moving party fails to raise the inadequacy of a Rule 50(a) motion in opposition to a Rule 50(b) motion, that party cannot raise waiver as an argument on appeal." Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc., 295 F.3d 1065, 1076 n.3 (10th Cir. 2002) (collecting cases). Therefore, plaintiffs waived this argument by not raising it in the district court.

We have described the standard of review for challenges to the denial of a civil defendant's motion for judgment as a matter of law as follows:

> We review de novo the district court's ruling on a motion for a directed verdict. In so doing, we apply the same standard applied by the district court: whether the evidence, viewed in the light most favorable to the nonmoving party, presents a disagreement sufficient to mandate submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. A directed verdict is justified only where the proof is all one way or so overwhelmingly preponderant in favor of the movant so as to permit no other rational conclusion. In reviewing the district court's ruling,

we cannot assess credibility of witnesses or substitute our judgment for that of the jury.

Hinds, 988 F.2d at 1045 (internal citations omitted).

Under Oklahoma law, which the parties agree is controlling, causation includes the traditional components of "cause in fact" and "legal causation." McKellips v. St. Francis Hosp., Inc., 741 P.2d 467, 470 (Okl. 1987). In fraud cases, there are two methods of measuring damages: (1) the out-of-pocket rule, and (2) the benefit-of-the-bargain rule. LeFlore v. Reflections of Tulsa, Inc., 708 P.2d 1068, 1076 (Okl. 1985). The out-of-pocket rule "allows the plaintiff to recover the difference between the value given up and the actual value received where the former is greater. Id. The benefit-of-the-bargain rule "provides the plaintiff with the difference between the value the plaintiff gave and the amount the defendant represented the plaintiff would receive." Id. Oklahoma has adopted a form of the benefit-of-the-bargain rule under which a plaintiff may "recover the difference between the actual value received and the value the defrauded party would have had if it had been as represented." Id. at 1077. This measure of damages allows a plaintiff to recover for damages that were the "natural and probable result" of the fraudulent inducement. Id. at 1077; see also Oklahoma ex rel. Southwestern Bell Tel. Co. v. Brown, 519 P.2d 491, 495 (Okl. 1974) (stating that "the gist of fraudulent misrepresentation is the production of a false impression . . . and damage sustained as the natural and probable consequence of the acts charged").

Knight attributes plaintiffs' lost investment to the weak market prices for natural

16

gas, poor production from the gas field, and the burdensome terms of the EIF loan. Plaintiffs' theory of the case at trial was that the Arkansas Project was doomed from the beginning because KEMCO and the Moores were "in cahoots" and were "obligated to each other, not to the LLC." App. at 3922. Wetwiska testified that, "We couldn't make good, reasonable evaluations of the information coming in, because it was biased." Id. at 3958. Further, he testified that Okland would not have invested in the Arkansas Project if it had known all of the facts about the relationship between Knight and the Moores. Gershen testified that he would have walked away from the deal if he had known about the undisclosed payment by KEMCO to M&M Gas. The jury apparently accepted the plaintiffs' theory.

Knight notes that plaintiffs were still interested in the Arkansas Project as late as October 1998 and argues their continued interest showed their investment had not been lost as a result of defendants' misrepresentations and omissions, which plaintiffs knew about well before that time. Knight's argument is misguided. The crux of the issue is not *when* plaintiffs discovered or should have discovered the fraud, but whether there was sufficient evidence to allow the jury to conclude that plaintiffs' loss, whenever it occurred, was the natural and probable consequence of the fraud. While there may have been some evidence that other factors contributed to plaintiffs' loss, there is no basis for substituting our judgment for that of the jury. As noted, a directed verdict is only justified if the evidence allows no other rational conclusion. We conclude that the evidence

presented at trial was sufficient to allow the jury to rationally conclude that defendants'

fraudulent conduct caused plaintiffs' entire loss.

*Evidentiary rulings*

Knight argues the district court abused its discretion in allowing defendants to use

the term "kickback" and "permitting the impeachment of Knight with irrelevant,

subsequent-in-time, collateral matters." Aplt. Br. at 53.

We may reverse the district court's decision to admit or exclude evidence only if

there has been an abuse of discretion. Hinds, 988 F.2d at 1047. See also United States v.

Kingston, 971 F.2d 481, 487-88 (10th Cir. 1992) (applying abuse of discretion standard to

district court's decision to allow use of terms "straw-seller" and "straw-buyer"). Before

trial, Knight moved to preclude plaintiffs from "making any reference to the commission

agreement as being in any way improper, illegal or a 'kickback' or part of an 'artificially

inflated' KEMCO contract." App. at 945-46. The trial court ruled as follows:

> Knight's motion in limine to exclude any reference to a "kickback,"
> "scheme" or purportedly "illegal commission" agreement is denied in part
> insofar as it seeks to exclude references to "kickbacks" or "schemes," and is
> granted in part insofar as it seeks to exclude use of the term "illegal
> commission" or other references to "illegal."

Id. at 1080.

In light of the district court's ruling, Knight did not object to use of the term

"kickback" during trial. Plaintiffs argue that by failing to object, Knight waived any

objection to use of the term. There is no merit to plaintiffs' waiver argument. A pretrial

18

motion in limine preserves an issue for appeal when the issue: "(1) was adequately presented to the district court; (2) is the type that can be finally decided in a pretrial hearing; and (3) is definitively ruled upon by the district court." Richardson v. Missouri Pac. R.R. Co., 186 F.3d 1273, 1276 (10th Cir. 1999); see also Fed. R. Evid. 103(a)(effective Dec. 1, 2000) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."). Here, the issue was fully presented to the court before trial, there was no reason for the court to delay its ruling, and the court ruled definitively. Accordingly, this court must determine whether the court abused its discretion in allowing plaintiffs to use the term "kickback."

By permitting use of the term "kickback," the district court did not prevent defendants from arguing that payments from KEMCO to M&M Gas were proper and legal. Indeed, the nature of those payments was a hotly contested issue at trial. The Moores contended the payments were made in exchange for M&M Gas stock and the Magic Medford plant. Knight characterized the payments as a commission, admitting that neither he nor his company particularly valued the M&M Gas stock. Plaintiffs used the term "kickback" as shorthand for their theory that KEMCO agreed to make secret payments to M&M Gas to secure the gas plant contract and that defendants thereafter concealed that arrangement from plaintiffs. Defendants were free to dispute plaintiffs' theory and did so throughout the case. There was nothing inherently prejudicial about

19

plaintiffs' use of the term "kickback." We conclude the district court did not abuse its discretion in allowing plaintiffs to use the term "kickback" or in refusing to give a limiting instruction to guide the jury's consideration of the evidence concerning the alleged "kickback."

The district court allowed plaintiffs to question Knight, over his objection, about KEMCO's internal operating manual which KEMCO disclosed to the SEC in its filings for the fiscal year of June 1996 to June 1997.[2] Portions of the manual were admitted into evidence, including a section on ethics which provided:

> [D]iverse activities can overlap and cause people to be torn between interest in both. Conflicts of interest on divided loyalty can be unproductive and result in neither interest being adequately served. . . .
> . . . Divided loyalty can also arise from less obvious involvement, such as substantial personal or family stock ownership, loans or holding an important position with a competing business, a client or a vendor.

App. at 2600, ¶¶ 5, 7. Knight objected to admission of the manual on the grounds that it was irrelevant and more prejudicial than probative. Plaintiffs respond in conclusory fashion that "[t]he Code was relevant and probative on the issues of duty to disclose, conflicts of interest, industry standards, fraudulent practices and proximate cause." Aplee. Br. at 53.

---

[2] Knight argues the ethics manual was not adopted by KEMCO until June 1997 and has no bearing on the propriety of Knight's conduct before then. Knight testified at trial that the code of ethics was not adopted by KEMCO until late 1997. However, there was undisputed evidence introduced at trial that Concord's SEC filing was in relation to the fiscal year starting in June 1996.

20

The manual has no bearing on the issue of proximate cause. Further, industry standards were never an issue in the case, and the jury was not instructed on industry standards. Nevertheless, the code of ethics is marginally relevant to the conflict of interest question. Moreover, it is relevant for the purpose of refuting Knight's testimony that his company merely had paid M&M Gas a "commission" pursuant to KEMCO's general company policy.

Knight argues the manual should have been excluded under Federal Rule of Evidence 403 as more prejudicial than probative. "As has been stated many times, Rule 403 does not protect a party from all prejudice, only unfair prejudice." Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1274 (10th Cir. 2000). Without doubt, KEMCO's manual was introduced by plaintiffs because it paralleled their theory of liability. However, nothing in the record suggests the potentially prejudicial impact of the manual outweighed its probative value.

Knight contends the two evidentiary issues "in the aggregate . . . rose to the level of plain error." Aplt. Br. at 53. In this case, a cumulative error analysis would be appropriate only if we concluded that the district court erred by allowing use of the term "kickback" and by admitting KEMCO's manual *and* then concluded that each error by itself was harmless. See Duckett v. Mullin, 306 F.3d 982, 992 (10th Cir. 2002). Further, Knight does not explain how the "plain error" standard of review is relevant. Knight objected to both evidentiary rulings. The "plain error" standard would be appropriate if

21

Knight had not timely objected in the district court.  See Pandit v. Am. Honda Motor Co.,

82 F.3d 376, 379 (10th Cir. 1996); Fed. R. Evid. Rule 103(d).

*New theories and allegations in final pretrial order*

Knight argues the district court erred in allowing plaintiffs to "raise new

allegations and theories" in the pretrial order that were not pled in the complaint.  Aplt.

Br. at 55.  He also argues that the court erred in denying his request for a continuance.

The pretrial order is the controlling document for trial.  Wilson v. Muckala, 303

F.3d 1207, 1215 (10th Cir. 2002).  "[T]he inclusion of a claim in the pretrial order is

deemed to amend any previous pleadings which did not include that claim."  Id.  On

August 23, 2001, the parties jointly filed a final pretrial report.  On August 28, the district

court adopted the final pretrial report as its pretrial order without addressing Knight's

objections contained in the report.  Knight's motion to strike was denied at the pretrial

conference.  On the first day of trial, Knight moved for a continuance to conduct

additional discovery, which was denied.

Although the pretrial order supersedes the pleadings, this court has stated that it

does not "normally expect to see claims or defenses not contained in the pleadings

appearing for the first time in the pretrial order."  Id.  "Such a practice deprives one's

adversary of fair notice, possibly discovery, and the opportunity for motion practice, and

is subject to abuse by those who employ a sporting theory of justice.  The laudable

purpose of Fed. R. Civ. P. 16 is to avoid surprise, not foment it."  Id. at 1215-16.  On the

other hand, "[a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." Evans v. McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991) (internal quotations omitted). By permitting the assertion of additional theories and allegations in the pretrial order, the district court was effectively allowing plaintiffs to amend their complaint. A motion to amend a pleading is governed by Federal Rule of Civil Procedure 15(a), which states that leave to amend shall be freely given "when justice so requires." Fed. R. Civ. P. 15(a).

Here, because Knight essentially argues the district court erroneously permitted a last-minute amendment to the pleadings, we apply the standard of review of a district court's grant of a motion to amend. The decision to grant or deny a motion to amend is committed to the sound discretion of the trial court, and the district court's decision is not subject to review on appeal except for abuse of discretion. See Nettis v. Levitt, 241 F.3d 186, 192 (2d Cir. 2001). "The denial of a continuance is reviewable only under the standard of arbitrary abuse of discretion, upon a showing of manifest injustice." Morrison Knudsen Corp. v. Fireman's Fund Ins. Co., 175 F.3d 1221, 1230 n.4 (10th Cir. 1999) (internal quotations omitted).

It does not appear that Knight was deprived of fair notice or discovery or that there was reason for him to be surprised by the claims and allegations contained in the pretrial

23

order. Knight argues the court erred by allowing plaintiffs to pursue "conspiracy" and "joint venture" theories at trial when neither theory was mentioned expressly in the complaint. The gist of the complaint is that defendants, including the Moores and Knight, worked together to induce plaintiffs to invest under false pretenses and that thereafter defendants continued to work together to conceal important information from plaintiffs. The complaint also requested that defendants be held jointly and severally liable. These allegations were sufficient to put Knight on notice of conspiracy and joint venture claims.

Knight also argues the district court erred by allowing plaintiffs to present evidence regarding three alleged misrepresentations not specifically mentioned in the complaint: (1) the KEMCO contract was negotiated at arm's length, (2) Knight considered the Arkansas Project viable, and (3) KEMCO successfully had completed the Blacklake project. The record indicates that Knight was put on notice about each of these allegations well in advance of trial. Knight's first interrogatory requested that plaintiffs set forth any facts demonstrating that Knight made fraudulent statements or otherwise committed fraud. Plaintiffs responded on May 3, 2001, in part as follows:

> Deral Knight discussed the Black Lake plant and his prior work with the Moores . . . . Jim Moore discussed what a great plant KEMCO had constructed and a great job KEMCO had done on the Black Lake Project. Likewise, Deral Knight represented that the Moores were top notch engineers who knew their business. . . .
> Deral Knight concurred that the Business Plan was a simple project and a good project . . .
> Both expressly and impliedly, Deral Knight represented that the KEMCO Contract had been competitively bid and negotiated at arm's length.

24

App. at 572, 574. Knight deposed both Wetwiska and Keeney after having received these responses. Discovery was not closed until July 1, 2001, nearly two months after plaintiffs responded to Knight's interrogatories. We conclude the district court did not abuse its discretion in adopting the pretrial report as its pretrial order, in denying Knight's motion to strike material from the pretrial order, or in denying Knight's motion for a continuance.

*Statute of limitations*

Knight argues that certain allegations by plaintiffs were barred by the statute of limitations and should not have been submitted to the jury. Although plaintiffs argue that Knight waived the statute of limitations issue by failing to raise it in the district court, he clearly raised the issue in his Rule 50(a) motion at the close of plaintiffs' case and which he renewed at the close of all of the evidence. His failure to renew the issue in his post-verdict Rule 50(b) motion does not bar him from raising the issue on appeal. See Morrison-Knudsen, 175 F.3d at 1246.

Under Oklahoma law, a cause of action for fraud must be brought within two years after the cause of action "accrued." 12 Okla. Stat. § 95(3) (providing that an action for fraud "shall not be deemed to have accrued until the discovery of the fraud"). "The discovery rule allows the limitation period in certain tort cases to be tolled until the fraud is discovered or until the date the defrauded party, by the exercise of ordinary diligence, might have recognized the deception." Smith v. Baptist Found. of Oklahoma, 50 P.3d 1132, 1137-38 (Okla. 2002). "The question of when fraud is discovered or should have

25

been unearthed with the exercise of ordinary diligence is one of fact dependent on the surrounding circumstances, the relationship of the parties, and all other elements peculiar to the cause." Id.at 1138; see also Wolf v. Preferred Risk Life Ins. Co., 728 F.2d 1304, 1307 (10th Cir. 1984) ("Questions of when a reasonable person would discover an injury . . . are generally within the province of the jury.").

In this case, because the complaint was filed on August 31, 1999, plaintiffs were prohibited from recovering for any fraudulent act or omission they discovered or should have discovered prior to September 1, 1997. As the party asserting the statute of limitations as a defense, it was Knight's burden to present evidence establishing the time bar. See MBA Commercial Constr., Inc. v. Roy J. Hannaford Co., 818 P.2d 469, 472 (Okla. 1991). The district court denied defendants' Rule 50 motion without specifically addressing the statute of limitations issue, stating: "The court just believes that a reasonable jury could differ and that the matters are at least disputed such that a jury could find for the Plaintiff." App. at 4308.

Knight's statute of limitations argument relies upon the following evidence in the record: (1) Keeney's testimony that he learned sometime "shortly after" September 27, 1996, that Knight owned shares in M&M Gas; (2) Keeney's testimony that he saw a document on or around June 5, 1997, that indicated Knight owned 50 shares of M&M Gas stock and that Knight's wife owned 150 shares; (3) Keeney's testimony that Okland approved approximately $400,000 in change orders (apparently after the Moores'

26

February 1997 status report); and (4) testimony from another proceeding by plaintiffs' accountant that by June 1997, it was apparent that Moore may have thought that he had authority to approve change orders. Id. at 3264-65, 3265-66, 3105-06, 3481-82. See Aplt. Br. at 57-58. According to Knight, this evidence unequivocally shows that plaintiffs knew or should have known prior to September 1, 1997, that (1) the KEMCO contract was *not* a turnkey contract, (2) Moore already had been designated as project manager, (3) Knight and his wife had an ownership interest in M&M Gas, (4) the KEMCO contract was *not* negotiated at arm's length by unrelated parties, and (5) there were conflicts of interest involved in the Arkansas Project.

The evidence does not establish that plaintiffs knew or should have known prior to September 1, 1997, that the KEMCO contract was not a turnkey contract. The fact that Okland approved certain change orders prior to that date is not conclusive. At trial, Wetwiska and the Moores testified that even turnkey contracts sometimes provide for change orders and that change orders may be agreed to even when a project is governed by a turnkey contract.

Knight has not directed our attention to any evidence that plaintiffs knew or should have known prior to September 1, 1997, that Moore had been *designated* as the buyer's project manager. The testimony of plaintiffs' accountant was far from definitive. At most, his testimony conveyed that in June 1997 it appeared that Moore may have *thought* he had authority to approve change orders.

27

While there is undisputed evidence that plaintiffs knew by no later than June 1997 that Knight and his wife had an ownership interest in M&M Gas, the jury was not instructed to consider merely whether defendants fraudulently omitted or concealed the fact of Knight's stock ownership. The jury was instructed to consider the following alleged omission: "Defendant Deral D. Knight and his wife would receive and own 10% of the outstanding stock in M&M Gas Processing Corp., if defendants James D. Moore and James A. Moore, Sr. could induce plaintiffs to invest and fund the Arkansas Project." App. at 1031.

Knight has not directed our attention to any evidence establishing that plaintiffs knew or should have known prior to September 1, 1997, that the KEMCO contract was not negotiated at arm's length. Although there is evidence that plaintiffs learned on or around June 1997 that Knight and his wife had an ownership interest in M&M Gas, it does not necessarily follow that plaintiffs knew or should have known that the contract was not negotiated at arm's length,

While Knight has directed this court's attention to evidence that plaintiffs knew or should have known of one type of conflict of interest prior to September 1, 1997 (Knight's stock ownership), the central issue of the case was not the mere fact of Knight's stock ownership but the manner in which the Knights acquired the stock, allegedly through a so-called "kickback" scheme. Plaintiffs have argued throughout this case that the Moores and Knight were mutually obligated to each other by this scheme and,

28

therefore, they were unable or unwilling to fulfill the legal duties owed to plaintiffs. The fact that plaintiffs discovered one conflict of interest prior to September 1, 1997, does not mean that plaintiffs should have discovered others that were still being concealed.

We conclude it was not error to submit the case to the jury and that the evidence presented at trial was sufficient to allow the jury to rationally conclude that plaintiffs' claims were not time barred.

*Sufficiency of evidence to support finding of joint venture relationship*

Knight argues there was insufficient evidence in the record to support the jury's finding of a joint venture. We disagree. To establish a joint venture, a plaintiff must show (1) a joint interest in the subject matter; (2) an express or implied agreement to share in the profits and losses of the venture; and (3) action or conduct showing cooperation between the parties in the venture. Martin v. Chapel, Wilkinson, Riggs & Abney, 637 P.2d 81, 85 (Okla. 1981).

Here there is ample evidence that defendants had a joint interest in the Arkansas Project and in misinforming and concealing information from potential investors. While Knight's objective was to obtain a lucrative construction contract, the Moores' aim was to secure an interest in any proceeds of the Arkansas Project without putting their own capital at risk. Further, Knight's price lists and the corresponding payments flowing between the defendants would allow the jury rationally to infer the existence of an express or implied agreement between the defendants. Finally, there is evidence that the

29

Moores and Knight acted in a highly cooperative fashion. For example, there is evidence that the Moores regularly concealed KEMCO's shortcomings from plaintiffs and that the Moores and Knight reached a settlement in regard to KEMCO's proposed change orders to pressure Okland to make payments to KEMCO.

*Denial of Rule 60(b)(3) motion (Case No. 03-6026)*

In June 1997, the LLCs formed Compression Solutions Company, L.L.C. (CSC). CSC then purchased from and leased back to the LLCs eight compressors for the Arkansas Project. The combined monthly lease payment from Magnolia and MKP to CSC was approximately $60,000. In December 1998, the LLCs filed voluntary Chapter 11 bankruptcy petitions. CSC sought payment for claims related to the leases. EIF filed an adversary complaint seeking a declaratory judgment that CSC was not entitled to payment. In his Rule 60(b)(3) motion, Knight contended the bankruptcy court's opinion and Keeney's testimony at the adversary proceeding were concealed by plaintiffs during discovery in the underlying case, and Keeney's testimony at the adversary proceeding directly contradicted his testimony before the district court in the underlying case.

A party moving for relief pursuant to Rule 60(b)(3) must establish the "alleged misconduct by clear and convincing evidence," and this can only be done by showing that the opposing party "acted with an intent to deceive or defraud the court, by means of a deliberately planned and carefully executed scheme." Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999) (internal quotations omitted). A retrial pursuant to Rule

30

60(b)(3) is mandated by discovery misconduct only if the challenged behavior "substantially . . . interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial." Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999) (internal quotations omitted). In this case, the district court found that Knight failed to establish the alleged misconduct by clear and convincing evidence and, alternatively, any misconduct that did occur did not interfere with Knight's ability to prepare for and proceed at trial.

This court reviews a district court's denial of a Rule 60(b) motion for abuse of discretion. Stubblefield v. Windsor Capital Group, 74 F.3d 990, 994 (10th Cir. 1996). In deciding whether the district court abused its discretion, this court "remain[s] mindful relief under Rule 60(b) is extraordinary and may only be granted in exceptional circumstances." Id. (internal quotations omitted).

When plaintiffs filed suit, the Western District of Oklahoma had opted out of the disclosure provision of Federal Rule of Civil Procedure 26(a)(1). See WDOK-LR 26.1(a). The district's local rule required initial disclosure of "[a] general description, including the location, of all books, documents, data, compilations, and tangible things in the possession, custody, or control of the party that are likely to bear significantly on any claim or defense." WDOK-LR 26.2(a)(2).

By letter dated November 29, 2000, plaintiffs gave a general description of the documents they possessed and their location, and made the documents available for

31

inspection and copying. During April 2001, Knight and his attorneys spent two days in the offices of plaintiffs' attorneys reviewing at least 73 boxes of documents in a large conference room and an unoccupied office. According to the affidavit of plaintiffs' counsel, Brian Peterson, on the first day of document production, over 20 boxes of documents relating to CSC and the adversary proceeding were located in the conference room, including exhibits admitted at the adversary proceeding, CSC's exhibit list and exhibits, EIF's exhibit list and exhibits, exhibits used in depositions, and documents produced by EIF to CSC and vice-versa. According to Peterson, the documents were produced as they were organized, maintained, and stored in the usual and ordinary course of business.

On day two of the document production, Peterson and plaintiffs' counsel, Andrew Walding, discussed the CSC adversary proceeding. According to Peterson's affidavit, Walding asked about the nature of the CSC adversary proceeding. There is some dispute about where the conversation took place and the content of the conversation. According to Peterson, he explained the general nature of the adversary proceeding. Walding asked whether plaintiffs were seeking damages against Knight as a result of plaintiffs' liability related to the CSC proceedings. When Peterson stated that plaintiffs were not seeking such damages, Walding stated he did not want to review any more documents related to the adversary proceeding. Peterson's affidavit concerning his conversation with Walding is consistent with that of Peterson's associate, Vance Brown, who stated he was present

32

during the conversation. Peterson also stated in his affidavit that he made available to Walding the pleadings from the adversary proceeding, the entire trial transcript, and the depositions of Keeney and Wetwiska taken in the adversary proceeding. In Walding's deposition, he testified that Peterson made him aware of the CSC adversarial proceeding. Walding could not recall whether Peterson offered to produce the pleading files from the CSC adversary proceeding. He testified that "[w]e were essentially left to ourselves." App. II at 574.

During the two-day document inspection, plaintiffs' counsel created a privileged document log of any document to be withheld based upon privilege. The following appeared on the log: "Box #72 – EIF vs. CSC Pleading Files, attorney notes re: Bill of Costs related documents and legal research. I was advised by opposing counsel, Andy Walding, that he didn't want those documents." Id. at 647. On July 31, 2001, Knight filed a reply to plaintiffs' response to Knight's motion to compel production of certain documents. He attached a copy of plaintiffs' privileged document log, upon which he had numbered and circled the documents which were the subject of his motion to compel. Knight neither sought production of Box #72 nor took issue with Peterson's recitation of Walding's statement regarding the documents.

The district court found that "on day two of the two-day document production at plaintiffs' counsel's office, plaintiffs' counsel and Knight's counsel discussed the CSC adversary proceeding." Id. at 1003-04. Further, the court found that "Knight's counsel

33

inquired about CSC and the nature of the proceeding in which it was involved." Id. at

1004. The court also found that "[a]t the conclusion of the discussion, Knight's counsel

advised plaintiffs' counsel that he did not want to review any more of the documents

related to the CSC adversary proceeding." Id. On the basis of these findings, the district

court concluded:

> Knight has failed to establish by clear and convincing evidence that
> plaintiffs and their counsel intentionally or even accidentally failed to
> disclose or produce the bankruptcy opinion or Keeney's testimony. In fact,
> the Court finds Knight's counsel was properly advised of the CSC
> adversary proceeding and elected not to review any additional documents
> related to that proceeding. Accordingly, the Court finds Knight's Rule
> 60(b)(3) motion should be denied.

Id. at 1005. Because the district court's findings are supported by the evidence set forth

above, we conclude the court did not abuse its discretion in concluding Knight failed to

satisfy his burden of showing by clear and convincing evidence that plaintiffs were guilty

of misconduct within the meaning of Rule 60(b)(3).

*Arkansas litigation*

In Knight's reply to plaintiffs' response to his Rule 60(b)(3) motion, he alleged for

the first time that plaintiffs had failed to disclose and/or produce documents related to a

case in the Eastern District of Arkansas, Energy Arkansas, Inc. v. Okland Operating

Company, Inc. (the Arkansas Litigation). On appeal, as in his Rule 60(b) reply brief,

Knight argues the documents related to the Arkansas Litigation would show that

plaintiffs' losses were proximately caused by factors other than defendants'

34

misrepresentations and omissions. Knight did not submit any affidavit or other evidence indicating that the Arkansas Litigation had not been disclosed or that the related documents had not been produced. He did not submit any evidence indicating when he became aware of the Arkansas Litigation. Nor did Knight offer any explanation for belatedly raising the issue.[3] In light of the new allegation raised in Knight's reply, plaintiffs requested leave to file a surreply, to which Knight objected and which the court denied without explanation. Knight did not seek leave to amend his Rule 60(b)(3) motion and the district court did not address the Arkansas Litigation in its order denying Knight's motion.

A federal appellate court will not consider an issue not passed upon in the district court. Singleton v. Wulff, 428 U.S. 106, 120 (1976). When a litigant fails to raise an issue in the district court in a timely fashion and the district court does not address the merits of the issue, the litigant has not preserved the issue for appellate review. FDIC v. Noel, 177 F.3d 911, 915 (10th Cir. 1999). Moreover, district courts are not required to address arguments and allegations raised for the first time in a reply brief. See id. When a district court declines to entertain an argument raised for the first time in a reply brief,

---

[3] On appeal, Knight contends he first became aware of the Arkansas Litigation on October 9, 2002, when plaintiffs mentioned the case in a motion for additional time to respond to the Rule 60(b) motion. However, plaintiffs referred to the Arkansas Litigation by caption and case number in two earlier motions – on July 30, 2002, in a motion for extension of time filed in this court, and on August 30, 2002, in a request for extension of time filed in the district court.

the argument has not been preserved for appellate review.  See id.  In this case, Knight's argument regarding the Arkansas Litigation has not been preserved for appellate review and we will not consider it.

*Motion to supplement appendix*

Knight seeks to supplement the appendix with documents referred to as "Exhibit 880" and "Exhibit 882."  Both exhibits relate to the Arkansas Litigation.  Because his argument regarding the Arkansas Litigation has not been preserved for appeal, the exhibits are irrelevant to this appeal.  The motion to supplement is moot.

*Subject matter jurisdiction*

We note that the jurisdictional statement contained in plaintiffs' complaint (which was never amended) is technically deficient.  Although the citizenship of the corporate plaintiffs is properly alleged,[4] plaintiffs only allege that defendants are residents of Texas, which is insufficient.

Allegations supporting diversity jurisdiction must be pleaded affirmatively, and there are two components to diversity jurisdiction – complete diversity of *citizenship* and an amount in controversy in excess of $75,000.  28 U.S.C. § 1332.  With regard to citizenship of individual parties, "allegations of mere 'residence' may not be equated with

---

[4] Okland is an Oklahoma corporation with its principal place of business in Oklahoma City and, therefore, is a citizen of Oklahoma.  IFSG is a Delaware corporation with its principal place of business in Oklahoma City and, therefore, is a citizen of Delaware and Oklahoma.  See 28 U.S.C. § 1332(c)(1) (providing corporation is citizen of both state of incorporation and state of principal place of business).

'citizenship' for the purposes of establishing diversity." See Whitelock v. Leatherman, 460 F.2d 507, 514 (10th Cir. 1972). Where the pleadings are found wanting, an appellate court may review the record for evidence that diversity exists. Id. at 514-15.

In this case, there is no evidence in the record from which we can determine the citizenship of defendants. The district court did not inquire into the pertinent facts. The case has proceeded without notice of the jurisdiction problem and there has been no dispute as to jurisdiction. Amendments of jurisdictional pleadings at the appellate level are expressly permitted by 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."). In Whitelock, we allowed such an amendment.

In the interests of judicial efficiency, we have completed our review of the entire case as indicated and will allow plaintiffs to amend their complaint on the following terms and conditions: Within 20 days after the filing of this opinion, plaintiffs shall file in the district court, with a certified copy to this court, a verified amendment to the jurisdictional pleadings of the complaint indicating the citizenship of all parties at the time of the filing of the original complaint. In the event such amendment is not timely accomplished, the Clerk of this court is directed to promptly calendar these appeals for further consideration.

The judgments in both appeals are AFFIRMED subject to amendment of the

jurisdictional pleadings as set forth above. Knight's motion to supplement is DENIED as moot.

Entered for the Court

Mary Beck Briscoe
Circuit Judge